**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| BRENDAN FERRAIOLI, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>DNOW INC., DAVID A. CHERECHINSKY, MARK B. JOHNSON, RICHARD J. ALARIO, TERRY BONNO, GALEN COBB, PAUL COPPINGER, KAREN DAVID-GREEN, RODNEY EADS, and SONYA READ,<br><br>Defendants. | **Case No:**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Brendan Ferraioli ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding DNOW Inc. ("DNOW" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. [1]

---

[1] Unless otherwise stated, all emphasis is added.

**NATURE OF THE ACTION**

1.      This is a class action on behalf of persons or entities who held DNOW common stock as of the August 5, 2025 record date ("Record Date") and were thus entitled to vote at DNOW's September 9, 2025 special meeting on the merger of DNOW and MRC Global Inc. ("MRC Global"), whereby DNOW would acquire MRC Global, seeking to pursue remedies under Section 14(a) of the Exchange Act of 1934 (the "Exchange Act").

**JURISDICTION AND VENUE**

2.      The claims asserted herein arise under and pursuant to Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a) and Rule 14a-9 promulgated thereunder (17 C.F.R. § 240.14a-9), and Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)).

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants (defined below), directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, held DNOW common stock as of the close of business on August 5, 2025 and was thus entitled to vote on the Merger via the Proxy disseminated on August 5, 2025 on Form 424(b)(3).

2

7.  Defendant DNOW states that it is a "premier energy and industrial solutions provider with a legacy of over 160 years as a leading distributor of pipe, valves, fittings (PVF), gas products, pumps and fabricated equipment."

8.  Prior to DNOW's acquisition of MRC Global (the "Merger"), MRC Global described itself as a holding company that owned subsidiaries which were "global distributors of pipe, valves, fittings ("PVF") and infrastructure products and services[.]"

9.  Defendant DNOW is incorporated in Delaware, and its head office is located at 7402 North Eldridge Parkway, Houston, Texas, 77041. DNOW securities trade on the New York Stock Exchange (the "NYSE") under the ticker symbol "DNOW."

10.  Defendant David A. Cherechinsky ("Cherechinsky") served as the Company's President and Chief Executive Officer ("CEO") at all relevant times. He also served as a Director at the Time of the Proxy statement (defined below)

11.  Defendant Mark B. Johnson ("Johnson") served as the Company's Executive Vice President and Chief Financial Officer ("CFO") at all relevant times.

12.  Defendant Richard J. Alario ("Alario") served as the Chairman of DNOW's Board of Directors at the time of the Proxy statement.

13.  Defendant Terry Bonno ("Bonno") served as a DNOW Director at the time of the Proxy.

14.  Defendant Galen Cobb ("Cobb") served as a DNOW Director at the time of the Proxy.

15.  Defendant Paul Coppinger ("Coppinger") served as a DNOW Director at the time of the Proxy.

16. Defendant Karen David-Green ("David Green") served as a DNOW Director at the time of the Proxy.

17. Defendant Rodney Eads ("Eads") served as a DNOW Director at the time of the Proxy.

18. Defendant Sonya Reed ("Reed") served as a DNOW Director at the time of the Proxy.

19. Defendants Cherechinsky and Johnson are referred to herein as the "Officer Defendants"

20. Each of the Officer Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) approved or ratified these statements in violation of the federal securities laws.

21.    DNOW is liable for the acts of the Officer Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

22.    Defendant DNOW, the Officer Defendants, and the Director Defendants (defined below), are collectively referred to herein as "Defendants."

23.    Defendants Cherechinsky, Alario, Bonno, Cobb, Coppinger, David-Green, Eads, and Reed (collectively, the "Director Defendants"), participated in Board meetings and conference calls, voted to approve the Merger, signed and/or authorized the signing of the Registration Statement (defined below) and/or Proxy, approved the Proxy, solicited approval of the merger through the Board's recommendation that DNOW shareholders vote in favor of the Merger, which appeared in the Proxy, and permitted the use of their names in connection with the solicitation of proxies from the shareholders. In their capacities as signatories of documents set forth below, as well as by virtue of their authority to approve the Merger, the Director Defendants possessed the power and authority to control the contents of the Proxy, as well as DNOW's press releases, investor and media presentations, and other SEC filings.

## BACKGROUND

24.    On June 9, 2025, DNOW issued a press release in which it announced that DNOW and MRC Global Inc. would combine in an all-stock transaction valued at approximately $1.5 billion.

25.    The Press release stated the following about the terms of the transaction:

Under the terms of the agreement, MRC Global shareholders will receive 0.9489 shares of DNOW common stock for each share of MRC Global common stock, representing a 8.5% premium to MRC Global's 30-day volume weighted average price ("VWAP") of $12.77 as of June 25, 2025. The exchange ratio, together with the closing prices of DNOW and MRC Global on June 25, 2025, results in a combined company enterprise value of approximately $3.0 billion. Upon completion of the

transaction, DNOW and MRC Global shareholders will respectively own approximately 56.5% and approximately 43.5% of the combined company on a fully diluted basis. The transaction has received unanimous approval by both DNOW and MRC Global Board of Directors.

**SUBSTANTIVE ALLEGATIONS**
**Materially False and Misleading**
**Statements Issued in the Proxy**

26.     On August 5, 2025, DNOW filed with the SEC a joint proxy statement (the "Proxy") on Form 424B3 to solicit votes for the Merger with MRC Global. That same day, the SEC filed a Notice of Effectiveness declaring effective the Proxy, as well as a registration statement dated July 23, 2025 on Form S-4 (the "Registration Statement"), which provided for the issuance of securities in relation to the Merger, and which was signed by the Director Defendants. The Proxy stated that DNOW's board of directors unanimously recommended that DNOW stockholders vote for the Merger.

27.     The Proxy contained the following risk disclosure under the headline "[t]he market price for DNOW common stock following the closing may be affected by factors different from those that historically have affected or currently affect DNOW common stock and MRC Global common stock":

> Upon completion of the mergers, holders of Eligible MRC Global shares and holders of MRC Global equity awards will receive shares of DNOW common stock. DNOW's financial position may differ from its financial position before the completion of the mergers, ***and the results of operations of the combined company may be affected by some factors that are different from those currently affecting the results of operations of DNOW*** and those currently affecting the results of operations of MRC Global.

> Accordingly, the market price and performance of DNOW common stock is likely to be different from the performance of MRC Global common stock in the absence of the mergers. In addition, general fluctuations in stock markets could have a material adverse effect on the market for, or liquidity of, DNOW common stock, regardless of DNOW's actual operating performance. For a discussion of the businesses of DNOW and MRC Global, and important factors to consider in connection with those businesses, see the documents attached hereto or incorporated by reference and referred to in "Where You Can Find More Information."

6

28.     The statement in ¶ 27 insufficiently warned of the risks of the Merger considering that MRC Global was implementing a new enterprise resource planning ("ERP") system which, if implemented poorly, could materially affect the price of DNOW stock after the contemplated Merger.

29.     The Proxy contained the following risk disclosure under the heading "[t]he combined company may be unable to integrate the business of DNOW and MRC Global successfully or realize the anticipated benefits of the merger":

The mergers involve the combination of two companies that currently operate as independent public companies. The combination of two independent businesses is complex, costly and time consuming, and each of DNOW and MRC Global will be required to devote significant management attention and resources to integrating the business practices and operations of MRC Global into DNOW. Potential difficulties that DNOW and MRC Global may encounter as part of the integration process include the following:

- ***the inability to successfully combine the business of DNOW and MRC Global in a manner that permits the combined company to achieve, on a timely basis, or at all, the enhanced revenue opportunities and cost savings and other benefits anticipated to result from the mergers***;
- complexities associated with managing the combined businesses, including difficulty addressing possible differences in operational philosophies and the challenge of integrating complex systems, technology, networks and other assets of each of the companies in a seamless manner that minimizes any adverse impact on customers, suppliers, employees and other constituencies;
- the assumption of contractual obligations with less favorable or more restrictive terms; and
- potential unknown liabilities and unforeseen increased expenses or delays associated with the mergers.

In addition, DNOW and MRC Global have operated and, until the completion of the mergers, will continue to operate, independently. It is possible that the integration process could result in:
- diversion of the attention of each company's management; and
- the disruption of, or the loss of momentum in, each company's ongoing businesses or inconsistencies in standards, controls, procedures and policies.

Any of these issues could adversely affect each company's ability to maintain relationships with customers, suppliers, employees and other constituencies or achieve the anticipated benefits of the mergers or could reduce each company's earnings or otherwise

adversely affect the business and financial results of the combined company following the mergers.

30.   The statement in ¶ 29 insufficiently warned of the risks of the Merger, considering that MRC Global was implementing a new ERP system which, if implemented poorly, could materially affect the price of DNOW stock after the contemplated Merger.

31.   The Proxy contained a risk disclosure under the heading "[t]he synergies attributable to the mergers may vary from expectations":

> ***The combined company may fail to realize the anticipated benefits and synergies expected from the mergers, which could adversely affect the combined company's business, financial condition and results of operations***. The success of the mergers will depend, in significant part, on the combined company's ability to successfully integrate the acquired business, grow the revenue of the combined company and realize the anticipated strategic benefits and synergies from the combination. DNOW and MRC Global believe that the combination of the companies will provide operational and financial scale, increasing free cash flow, and enhancing the combined company's corporate rate of return. However, achieving these goals requires, among other things, realization of the targeted cost synergies expected from the mergers. This growth and the anticipated benefits of the transaction may not be realized fully or at all, or may take longer to realize than expected. Actual operating, technological, strategic and revenue opportunities, if achieved at all, may be less significant than expected or may take longer to achieve than anticipated. If the combined company is not able to achieve these objectives and realize the anticipated benefits and synergies expected from the mergers within the anticipated timing or at all, the combined company's business, financial condition and results of operations may be adversely affected.

32.   The statement in ¶ 31 insufficiently warned of the risks of the Merger, considering that MRC Global was implementing a new ERP system which, if implemented poorly, could materially affect the price of DNOW stock after the contemplated Merger.

33.   The statements contained in ¶¶ 27, 29, 31 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants negligently understated the challenge of DNOW's merger

8

with MRC Global Inc. as a result of material issues affecting MRC Global's new enterprise resource planning system, which they knew of or should have known of, and (2) as a result, Defendants' statements about DNOW's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

## THE TRUTH BEGINS TO EMERGE

34.     On November 5, 2025, MRC Global issued a press release entitled "MRC Global Announces Third Quarter 2025 Results." The press release quoted Rob Saltiel, MRC Global's CEO and President, as saying the following:

> ***The implementation of our new enterprise resource planning (ERP) system in our U.S. segment encountered significant challenges that adversely impacted our revenues, profitability, and cash flows, during our third quarter***. We deployed extensive resources to ensure that customer service levels were maintained and that business operations could function as we addressed the system issues. I am pleased to report that our financial and operations performance improved dramatically by the end of our third quarter and that this more normalized performance has continued throughout the month of October. We greatly appreciate the patience of our customers and the hard work by the entire MRC Global team during this system transition."

35.     The next day, on November 6, 2025, the Merger was completed. DNOW issued a press release entitled "DNOW Completes Combination with MRC Global". The Press release announced the following:

> [DNOW] today announced that it has completed its acquisition of MRC Global Inc. ("MRC Global"), creating a premier solutions provider to the energy and industrial markets.
>
> Under the terms of the merger agreement, each share of MRC Global's common stock was converted into the right to receive 0.9489 shares of DNOW's common stock. In addition, MRC Global's stock will no longer be listed for trading on the New York Stock Exchange (the "NYSE"), and MRC Global will no longer have reporting obligations under the Securities Exchange Act of 1934, as amended.

36.     On February 20, 2026, DNOW issued a press release entitled "DNOW Reports Fourth Quarter and Full-Year 2025 Results." The release quoted Defendant Cherechinsky as

9

stating the following, in part:

> As we move into 2026, we have taken targeted actions to address persistent challenges related to the U.S. MRC Global ERP system transition, which went live in the third quarter of 2025. While these complexities have created near-term obstacles, we are actively addressing them and remain focused on positioning the business for long-term growth.

37.     Commenting on DNOW's financial results, Investing.com published an article during market hours on February 20, 2026 entitled "DNOW Q4 2025 slides: merger integration weighs on results." The article stated, in part, as follows:

> [DNOW] presented fourth quarter and full-year 2025 results on February 20, 2026, revealing the substantial impact of its November merger with MRC Global alongside *operational challenges that led to an earnings miss and sharp stock decline*. Shares plummeted 19.25% following the announcement, *closing at $13.24 as investors reacted to integration costs and ERP system complications that overshadowed the company's strategic progress.*
>
> The energy and industrial solutions provider reported adjusted earnings per share of $0.15 for the fourth quarter, missing analyst expectations of $0.16, while revenue of $959 million fell short of the $987.67 million forecast by 2.9%. *The company attributed the shortfall primarily to ongoing ERP system transition challenges in its U.S. operations and significant merger-related expenses.*

38.     The article additionally stated that DNOW's reported financial results "revealed a stark contrast between GAAP and adjusted metrics, underscoring the magnitude of merger-related costs. On a GAAP basis, DNOW reported a net loss of $89 million for the full year and $147 million for the fourth quarter alone."

39.     On February 20, 2026, before the market opened, DNOW held its Q4 2025 earnings call (the "Q4 2025 Call"). Defendant Cherechinsky disclosed the following on the Q4 2025 Call, including that MRC Global's IT system was such a mess that DNOW was abandoning its use wherever possible:

> And now shifting to comments about the *MRC Global U.S. ERP project, which is fair to characterize as an obstacle.*

10

*Prior to the merger, previous MRC Global management had disclosed that they had encountered challenges that adversely impacted the third quarter revenues, profitability and cash flows*. They had guided fourth quarter sequential revenue growth in the mid- to high single-digit percentage range in their third quarter earnings release.

*However, the fourth quarter actuals declined due to persistent ERP challenges*. For context, U.S. MRC Global represents about 40% of DNOW's business. Conversely, 60% of our business is not affected by ERP challenges, including the legacy MRC Global International business nor energy nor any of the legacy DNOW businesses. While we have been making progress bringing together DNOW and MRC Global, including with our people, customers and suppliers, we have identified the ERP challenges to be a much heavier lift than previously known. Design [architecture] is resulting in inefficiencies for certain core processes, continuing negative operating and financial impacts.

*Observed limitations across the system are that it is slow, impedes customer service, requires more resources, increases safety stock and difficulty in processing orders*. I am encouraged by the teamwork occurring around the clock as we collaborate on resolving the issues. *We have targeted actions to address the impact of ERP implementation*. The heritage DNOW IT and operational excellence teams are mobilized to execute a comprehensive remediation plan to capture and resolve the most critical obstacles.

*         *         *

*Where appropriate, we are now actively servicing select legacy MRC Global customers through DNOW systems*, and we are managing larger projects where possible through legacy DNOW operating systems to maximize transaction flows from order to payment

40.     Defendant Cherechinsky further disclosed the following in response to an analyst

question:

**Analyst**: Maybe starting first on a little bit more color on MRC's ERP transition. What was the impact in 4Q from the transition? Any color on when we should expect these headwinds to resolve going into '26? Were these issues broad-based across MRC's business in the U.S.? Or was it specific to certain sectors?

**Defendant Cherechinsky**: Okay. In terms of the impact, let me give some timing on a quarterly basis. Again, as I mentioned in my prepared remarks, the ERP issues are limited to U.S. MRC only, not the international MRC business. And of course, the ERP impacts don't affect the legacy business for DNOW.

In terms of the impact from the second quarter, -- the system was implemented August 6, 2025, and the revenue decline from the second to third quarter was pronounced, and MRC issued a press release when they announced their earnings and talked about that significant sequential decline.

11

They also talked about the notable recovery in revenues in September and October, and they forecasted growth going into the fourth quarter in the mid- to high single-digit range. I think what we've experienced in reality was a decline in revenues going into the fourth quarter. So there's been revenue loss attributable fully to the ERP implementation, both in the third and fourth quarters. So that impact is notable. In terms of the resolution for the system issues, we have all hands on deck to resolve the core infrastructure issues with Oracle for MRC Global U.S. We're not really sure when the resolution happens, but here's what we're doing to mitigate in the short term.

So we've -- immediately, we have DNOW -- DNOW systems focused on handling projects, especially bulky projects with a lot of deliveries that are cumbersome to move through the Oracle system and MRC. We're trying to push projects to the DNOW system to eliminate those snags that happen in Oracle.

***We've stood up -- we've added over 200 personnel in the field to maximize customer service, to mitigate customer frustration and to get products out the door and improve how we service our customers***. We've stood up a help desk solely focused on handling issues as they emerge in the field, while we have a parallel team working on resolving matters with our external partners.

41.     On this news, the price of DNOW stock fell $3.13, or 19.1%, to close at $13.23 on February 20, 2026. The following trading day, it fell a further $1.38 per share, or 10.4%, to close at $11.85 per share on February 23, 2026.

42.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

43.     Plaintiff brings this action on his own behalf and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who were DNOW shareholders and were entitled to vote on the Merger pursuant to the Proxy dated August 5, 2025, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of DNOW, members of the

Officer and Director Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

44.    The members of the Class are so numerous that joinder of all members is impracticable. At all relevant times, DNOW securities were actively traded on NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

45.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

46.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

47.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether the Proxy contained misstatements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants' acted with the requisite negligent state of mind in omitting and/or misrepresenting or failing to discover through due diligence material facts required to be in the Proxy

13

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

48.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of Section 14 of the Exchange Act and Rule 14(a)(9) Promulgated Thereunder Against All Defendants.

49.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

50.     This Count does not sound in fraud. Plaintiff does not allege that Defendants had scienter or fraudulent intent with respect to this Count as they are not elements of a Section 14(a) claim.

51.     SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

14

52.    Defendants prepared and disseminated the false and misleading Proxy specified above, which failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading in violation of Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder.

53.    By virtue of their positions within DNOW and their due diligence regarding the Merger, Defendants were aware of this information and of their duty to disclose this information in the Proxy. The Proxy was prepared, reviewed, and/or disseminated by the Defendants named herein. The Proxy misrepresented and/or omitted material facts, as detailed above. Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

54.    As stated herein, the Proxy contained untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading in violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. The Proxy was an essential link in the consummation of the Merger. The Defendants also failed to correct the Proxy prior to the Merger and the failure to update and correct false statements is also a violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

55.    As a direct result of the Defendants' negligent preparation, review and dissemination of the false and/or misleading Proxy, Plaintiff and the Class were precluded from exercising their right to vote on the Merger on a fully informed basis. At all times relevant to the dissemination of the materially false and/or misleading Proxy, Defendants were aware of and/or had access to the true facts concerning the true value of MRC Global, and the state of its business which they knew or should have known could harm existing DNOW shareholders. Thus, as a direct and proximate result of the dissemination of the false and misleading Proxy

15

that Defendants used to obtain shareholder approval of and thereby consummate the Merger, Plaintiff and the Class have suffered damages and actual economic losses in an amount to be determined at trial.

56.    The omissions and false and misleading statements in the Proxy were material in that a reasonable stockholder would have considered them important in deciding how to vote on the Merger. In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy and in other information reasonably available to stockholders.

57.    By reason of the foregoing, Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9(a) promulgated thereunder.

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**Against the Officer and Director Defendants**

58.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

59.    The Officer and Director Defendants acted as controlling persons of DNOW within the meaning of Section 20(a) of the Exchange Act, as alleged herein. By virtue of their positions as officers and/or directors of DNOW, and participation in, and/or awareness of DNOW's operations, and/or intimate knowledge of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of DNOW with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that are materially false and misleading, and the omission of material facts specified above.

16

60.     Each of the Officer and Director Defendants was provided with or had unlimited access to copies of the Proxy and other statements that were false and misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

61.     Each of the Officer and Director Defendants had direct and supervisory involvement in the negotiation of the Merger, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. In particular, the Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommends that DNOW stockholders vote for the Merger. The Officer and Director Defendants were thus involved in the making of the Proxy.

62.     In addition, as the Proxy sets forth at length, the Officer and Director Defendants were involved in negotiating, reviewing, and approving the Merger. The Proxy purports to describe the various issues and information that the Director Defendants reviewed and considered in connection with such negotiation, review and approval.

63.     By virtue of the foregoing, the Director Defendants had the ability to exercise control over and did control a person or persons who violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable under Section 20(a) of the Exchange Act.

64.     Plaintiff and other DNOW stockholders have no adequate remedy at law, and as a result of the Officer and Director Defendants' violations of Section 20(a) of the Exchange Act, are threatened with irreparable harm by virtue of being deprived of their entitlement to cast fully informed votes with respect to the Merger, as more fully explained above.

17

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

awarding plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: August 3, 2026                                    Respectfully submitted,

                                                         **THE ROSEN LAW FIRM, P.A.**
                                                         /s/ Phillip Kim
                                                         Phillip Kim, Esq., attorney-in-charge
                                                         Bar Number: 1036827
                                                         Laurence M. Rosen, Esq.
                                                         275 Madison Avenue, 40th Floor
                                                         New York, NY 10016
                                                         Telephone: (212) 686-1060
                                                         Fax: (212) 202-3827
                                                         Email: philkim@rosenlegal.com
                                                         lrosen@rosenlegal.com

                                                         *Counsel for Plaintiff*

18